IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

ANTHONY C. KAVANAUGH, #2214786     §

VS.                                §             CIVIL ACTION NO. 6:19cv150

NORRIS JACKSON, ET AL.          §

REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE

Plaintiff Anthony Clayton Kavanaugh, a former inmate confined within the Texas Department of Criminal Justice (TDCJ) proceeding *pro se*, filed this civil rights lawsuit pursuant to 42 U.S.C. § 1983. The case was referred to the undersigned United States Magistrate Judge for findings of fact, conclusions of law, and recommendations for the disposition of the case. For reasons explained below, the Court recommends that Plaintiff Kavanaugh's civil rights lawsuit be dismissed, with prejudice.

**I. Kavanaugh's Amended Complaint**

Kavanaugh's amended complaint, (Dkt. #10), is the operative pleading in this lawsuit. An amended complaint entirely supersedes and takes the place of an original complaint. *See Clark v. Tarrant Cnty.*, Tex., 798 F.2d 736, 740 (5th Cir. 1986). He is suing five Defendants: (1) Norris Jackson, Warden of the Beto Unit, (2) Dr. Clayton, (3) Practice Manager Michael Sizemore, (4) Lisa Phillips, Nurse Manager, and (5) Amanda Stampley, RN, for alleged violations of his constitutional rights occurring at the Beto Unit.

Specifically, Kavanaugh maintains that all five defendants acted with deliberate indifference to his serious medical needs. He explains that, on January 27, 2019, he went to the Medical Department at the Beto Unit and explained to "the Nurse RN" that he was having a sickle-cell crisis and needed emergency medical help. At that time, Defendant Stampley took his blood

1

pressure and told him that his vital signs were normal; in response, Kavanaugh explained that one cannot rule out a sickle-cell crisis because one would have to perform emergency blood work. Defendant Stampley then noted that TDCJ "doesn't have the laboratory to do the blood work" and "doesn't have the money to hire an outside agency." Defendant Stampley told him to go back to his cell, at which point Kavanaugh stated that he could die "if something wasn't done." Kavanaugh asserts that, on at least two occasions in January 2019, three times in February 2019, and four times in April 2019, he would call the medical department for help—and was returned to his cell.

Moreover, Kavanaugh states that on April 14, 2019, he saw Nurse Goldman "who would send me to the hospital." He denotes that Defendants told him that they could not do anything for his illness and that they would not take him to the hospital every time he said he was experiencing a sickle-cell crisis, as "[he] would be turned down by Nurse Stampley on the dates and months listed above." Defendant Stampley explained that "she has orders from Nurse Manager Lisa Phillips not to take care of [him] if [he] came to the medical department." Defendant Clayton would also state that he could not do anything for him and "how [he] shouldn't have come to prison."

At the bottom of his amended complaint, Kavanaugh outlines his distinct allegations against each Defendant as follows:

> Nurse Stampley caused me pain and suffering by refusing to get me to a local hospital to receive medical attention knowing that the unit couldn't provide the right medical help that I needed.
>
> Warden Jackson and Michael Sizemore refused to have me moved to a different medical unit or send me to a unit close to Hospital Galveston to [where] I could receive quick and fast medical care to deal with my sickle cell anemia causing me pain and suffering neglecting my medical needs and keeping me in an environment that was bad to my health an[d] possessed a life-threatening situation.
>
> Nurse Mgt. Lisa Phillips would go on to tell her medical staff to have me sent back to my cell when I come to medical complaining about my sickle cell [anemia]. I went through

pain and suffering, neglecting my medical needs, medical indifference, and kept me in a situation that was detrimental to my health and [posed] a life-threatening situation for me. I was refused medical care.

Dr. Harold Clayton: I would talk to him pl[e]nty of times in January and February 2019. I would go on to explain to Dr. Clayton how he's a medical doctor and how he knows that the only way someone going through a sickle cell crisis could be ruled out is by having a stat blood draw done and not a blood pressure. He would explain to me that I was right and how the TDCJ prison don't have that type of capabilit[ies] to perform the blood work needed for my medical illness. I would tell them that they need to hire an outside blood laboratory or send me to the local hospital when I would come to medical saying that I am having a sickle cell crisis. He would then go on to tell me how TDCJ doesn't have the money to hire an outside blood laboratory an[d] they couldn't send me to the hospital and that lately TDCJ has been getting on them for sending inmates out to the local hospital because every time they do that they would have to pay the hospital bill. An[d] the state does not have the money to keep paying those hospital bills. [] Dr. Clayton would go on to tell me how I shouldn't have come to prison. I would end up going through pain and suffering, dealing with medical malpractice, neglecting my medical needs that [posed] life threatening injuries and even death.

(Dkt. #10, pg. 6-7) (amended complaint).

## II. *Martinez* Report

Pursuant to an order of the Court, the Office of the Attorney General of Texas filed a report, (Dkt. #29) (sealed), addressing Kavanaugh's medical claims in accordance with *Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978) (citing with approval in *Parker v. Carpenter*, 978 F.2d 190, 191-92 (5th Cir. 1992)). The Report includes Kavanaugh's relevant medical records and submitted grievances. The Report also includes a detailed, twenty-two page affidavit from Dr. Glenda M. Adams, MD., M.P.H., who summarized Kavanaugh's complaint, summarized her medical findings, and meticulously outlined Kavanaugh's detailed medical care while housed at the Beto Unit from September 24, 2018, through April 29, 2019.

The Court has conducted an independent review of Kavanaugh's medical records and submitted grievances contained in the *Martinez* Report. Based on the review, the Court has determined that the Report accurately summarizes the contents of Kavanaugh's medical records,

treatment, and grievances. Kavanaugh responded to the *Martinez* Report by explaining that he respects Dr. Adams, but the issue in his lawsuit is that the Beto Unit did not have a blood laboratory, (Dkt. #39). Kavanaugh's medical records are therefore undisputed. The accuracy of his medical records has not been challenged.

### III. Kavanaugh's Medical Records

Kavanaugh maintains that Defendants failed to treat his sickle cell anemia, refused to treat him, and neglected his serious medical needs. He complains that the Texas prison system does not have emergency blood laboratories in every Unit, and argues that Defendants refused to take him to a local hospital when he presents to the Medical Department and tells them that he is having a sickle-cell crisis. As explained below, Kavanaugh's claims are refuted by the extensive medical records.

#### a. September 25, 2018 Medical Visit and Treatment

On September 25, 2018, one day after Kavanaugh arrived at the Beto Unit and underwent a "newly assigned" physical, Dr. Clayton gave an oral order for Kavanaugh's Tylenol #3 prescription for pain to be renewed for ten days or until October 6, 2018, (Dkt. #46, pg. id. #409-410). The Tylenol #3 is for pain associated with sickle-cell anemia. The medical record shows that Kavanaugh's compliance with taking his Tylenol #3 is 80.95%, while his compliance for taking his prescription for Hydroxyurea, medicine to treat sickle-cell disease, is 66.67%. *Id.*

#### b. September 27-30, 2018 Medical Visits and Treatment

Medical records illustrate that, on September 27, 2018, an officer notified medical staff that Kavanaugh was "laying down in the cage" waiting to be seen for a medical appointment, (Dkt. #46, pg. id. #417). When he was called, he was ambulatory to the ER "with a steady gate," appeared oriented—complaining of a "sickle cell flare up." *Id*. Kavanaugh explained that his pain

4

level was a 9 on the scale of 1 to 10. Nursing notes show that Defendant Stampley was the attending nurse, and that Kavanaugh was given fluids after three unsuccessful attempts at starting an IV. *Id.* Staff called Dr. Haque, who gave orders to send Kavanaugh to the local emergency room for a possible sickle-cell crisis. The records indicate that as he was waiting for transport to the emergency room, he was "resting comfortably with a 8/10 pain" level, breathing evenly and unlabored. Kavanaugh was transported by prison van to the Palestine Regional Medical Center (PRMC).

After time in the emergency room, Kavanaugh was admitted to the PRMC hospital on September 28, 2018, (Dkt. #48, pg. id. #420-22). He is treated with IV fluids, respiratory therapy, analgesics—and his symptoms improved. *Id.* at pg. id. #420. He was discharged on September 30, 2018, with diagnoses of 1) sickle cell vasco-occlusive pain crisis, 2) anemia due to sickle cell, and 3) morbid obesity with a BMI of 42. *Id.* Upon return to the Beto Unit, Kavanaugh was seen by medical staff and explains that he was experiencing pain at a level of 6 out of 10. *Id.* at pg. id. #431. Dr. Haque was contacted and orders Tylenol #3 for pain, two tablets immediately, then two tablets twice per day for twenty-one days. *Id.* at pg. id. #432-33.

### c. October 5-6, 2018, Medical Care and Treatment

Less than a week later, Kavanaugh began submitting Sick Call Requests (SCR) on October 5th and October 6th asking to see the doctor about pain, (Dkt. #46, pg. id. #436-38). He was seen by the Medical Department, specifically Defendant RN Stampley, on October 6, 2018. Kavanaugh is ambulatory to the Medical Department and is examined. Unable to place an IV, Kavanaugh is given water to drink and Defendant Stampley contacted the on-call provider, who ordered Kavanaugh be transported to the local hospital for further evaluation. *Id.* at pg. id. #441.

Kavanaugh was transported to Palestine Regional Hospital. The hospital diagnosed him with a sickle-cell crisis and ordered him to see a provider. Once back at the Beto Unit that same day, Kavanaugh was seen by Defendant Stampley, who evaluated him. *Id.* at pg. id. #447-48.

### d. October 8, 2018 and October 13, 2018 Medical Care and Treatment

As planned, Dr. Haque followed up with Kavanaugh on October 8, 2018 per the emergency room doctor's instructions—two days after his release from the hospital. Dr. Haque advised Kavanaugh to comply with taking his medications as prescribed and to keep his pending appointment with UTMB Hematology Clinic, (Dkt. #46, pg. id. #451). The nursing note of October 8, 2018 denotes that Kavanaugh's compliance with taking his prescription for Hydroxyurea for his sickle-cell disease was 52.94% while his compliance with taking his Tylenol #3 was 72.22%. *Id.*

Subsequently, a few hours later that same day, Kavanaugh returned to the Medical Department. *Id.* at pg. id. #452. He stated that he wants to speak to a provider about pain stemming from his sickle-cell disease, and noted that his pain was currently a 0 on the scale of 1 to 10. The examination by nursing staff denotes that he showed no signs of stress, was ambulatory with a steady gait. Kavanaugh was referred to a provider for further evaluation. *Id.* at pg. id. #457.

The medical records show that Kavanaugh returned to the Medical Department at the Beto Unit on October 13, 2018. He was a "walk-in" and appeared stable upon arrival. *Id.* at pg. id. #460. Kavanaugh complained about "pain due to sickle cell" and articulated that his pain was at a level 8 out of 10. LVN A. Hernandez completed an examination of Kavanaugh, and his vital signs were normal, respirations were normal, and normal orientation. Defendant Dr. Clayton was called and increased Kavanaugh's Tylenol #3 prescription for pain from two tablets twice per day to two tablets three times per day—for eight days, with the first dose beginning immediately, (Dkt. #46,

pg. id. #463). Nursing notes denote that once Kavanaugh was given that first dose of Tylenol #3, he became "eager to return to his cell." *Id.*   He was released to security and advised to drink water.

### e. October 14-28, 2018 Medical Care and Treatment

On October 13, 2018, Kavanaugh submitted another sick call request, asking to "see the doctor about renewing [his] pain medication." *Id.* at pg. id. #470. Nursing notes from October 15, 2018, denote that nursing staff notified Defendant Dr. Clayton that the pharmacy placed the Tylenol #3 on "hold," at which point Defendant Dr. Clayton re-ordered the Tylenol #3 for two tablets three times per day for six days. *Id.* at pg. id. #473.

Three days later, on October 18, 2018, Kavanaugh returned to the Medical Department as a "walk-in." He complained of pain in his joints and identified his pain as a 7 out of 10 and showed no signs of distress. The medical record illustrates that Kavanaugh was lying down on an ER bed talking to staff. After his vital signs were taken, Kavanaugh began complaining of chest pains—at which point an EKG was performed, revealing "sinus tachycardia" with a heart rate of 126 beats per minute, (Dkt. #46, pg. id. #480). Nursing staff called the provider, who gave orders to place an IV and provide 800 mg ibuprofen—when Kavanaugh explained that he is allergic to ibuprofen. Nursing staff attempted to place an IV, but were unsuccessful after four attempts; the provider was notified again, who then ordered monitoring of Kavanaugh in the ER "until able to be given Tylenol #3." *Id.* Kavanaugh remained lying in the ER bed with no signs of distress; nursing staff then gave Kavanaugh 1L of fluids to consume. However, Kavanaugh refused by stating that "I'm not going to drink that. I don't feel up to it." *Id.* Kavanaugh was then placed on oxygen and monitored until his next dose of Tylenol #3. The Tylenol #3 was given, at which point Kavanaugh "expressed eagerness to return to his cell." *Id.*

The following day, October 19, Defendant Dr. Clayton was Kavanaugh, (Dkt. #46, pg. id. #488). Kavanaugh requested pain medications and stated that he was previously taking MS Contin and morphine—further articulating that "I'm not allergic to opioid[s] or NSAIDS, only fentanyl." *Id*. at pg. id. #489. Defendant Dr. Clayton supplemented Kavanaugh's pain regimen with 800 mg of ibuprofen to be kept on his person (KOP) and to take three times daily. *Id*.

Kavanaugh submitted his next sick call request on October 20, 2018, one day later. In his request, he stated that he "need[s] [his] Tylenol #3 I seen him on 10/18 and he told me that he was going to order it." *Id*. at pg. id. #493. He was seen in the Medical Department the next day with the following notation:

> Presents with complaints of pain in joints and in chest. Was seen in ED at 11:00 for medication administration of Tylenol #3. At that time patient was laughing and talking with no complaints. Patient informed Tylenol #3 would expire today at 15:00. At that time patient insisted Dr. Clayton be called immediately. Patient informed Dr. Clayton not on call today and would not be called by staff for medication refill. Patient became teary eyed and said he had to have his T-3's. Patient then stated, "Well I will just have to come in for a sickle cell crisis I guess!"

*Id*. at pg. id. #495. The nursing notes denote that Kavanaugh "exhibits drug seeking behavior." *Id*. Staff called the provider who orders hydration through an IV and ibuprofen, (Dkt. #46, pg. id. #495). The IV ran for about thirty minutes when Kavanaugh explained that the IV stopped; nursing staff note that 200 cc infused and that his catheter appears to have been manipulated. *Id*. at pg. id. #495.  Kavanaugh began taking oral fluids without difficulty, appeared to be in no distress, and was discharged.

The record includes Kavanaugh's subsequent refusal of treatment, signed on October 22, 2018. He was scheduled to see Dr. Haque, but refused even though he was told such refusal "could lead to medical complications." *Id*. at pg. id. #501. Defendant Dr. Clayton gave a verbal order to nursing staff to renew his Tylenol #3 for two tablets three times daily for 21 days. *Id*. at 505.

In his final visit to the Medical Department in October 2018, Kavanaugh arrived at the Department on October 27, 2018. He was ambulatory and complained of body aches and joint pain, stating that his pain level is a 9 out of 10. *Id*. at pg. id. #508. Nurse Goldman performed an exam, which revealed that Kavanaugh's blood pressure was elevated and his pulse was a 125. Dr. Haque was called and ordered that Kavanaugh be transported to the Palestine Regional Medical Center (PRMC) Emergency Room for evaluation. *Id*. at pg. id. #510. He was transported to the hospital via prison van, and released a few hours later with a diagnosis of sickle-cell disease without crisis. *Id* at pg. id. #514.

### *f. December 2018 Medical Care and Treatment*

Kavanaugh's medical records reflect that he received care throughout the month of December 2018. After hospitalization in November 2018 at the Hospital Galveston where medical staff diagnosed him with, among other ailments, "faking priapism with penile implant," Kavanaugh was sent to an assisted living infirmary bed at the Estelle Unit. Dr. Adams, in summarizing his medical care immediately after his arrival at the Estelle Unit, remarks as follows:

> Mr. Kavanaugh is housed at the Estelle Unit Regional Medical Infirmary from December 1, 2018 through December 6, 2018. Upon arrival, a Registered Nurse documents "Pt (patient) with dx (diagnosis) of sickle anemia, was very upset when he was told Dr. Julye did not renew his T3's (Tylenol #3). Per chart review, pt (patient) frequently c/o (complains of) pain with resultant send-outs to r/o (rule out) sickle cell crisis. Per HG (Hospital Galveston) notes, plan is to continue to wean pt (patient) off narcotics." [Of note is that Dr. Julye does order Mr. Kavanaugh extended release (ER) morphine twice daily, the chronic pain medication duloxetine (Cymbalta), and hydroxyurea to prevent/reduce sickling of blood cells]. Also, due to Mr. Kavanaugh's continued complaints of pain, on December 3rd, Dr. Julye supplements Mr. Kavanaugh's pain medication with liquid Tylenol #3, four times daily for 5 days. On December 4, Dr. Julye documents that Mr. Kavanaugh has been engaging in threatening, aggressive behavior toward medical staff. In her discharge summary, Dr. Julye clarifies that Mr. Kavanaugh was "cursing at staff. Threatening staff. Says he will sue to get the medications he wants. Says no one is talking to him. I and the staff returned to his room 3 times to visit him yesterday while he was shouting." Due to his behavior, Mr. Kavanaugh is evaluated by Mental Health Services on December 6th but found not to have a current mental health diagnosis but simply to be angry about his medical treatment. Dr. Julye discharges Mr. Kavanaugh from the Estelle Unit infirmary

with an order for Mr. Kavanaugh to have one tablet of Tylenol #3 three times daily for pain with the prescription to expire on December 27th with no refills.

(Dkt. #46, pg. id. #277; #560-77).

The record further reflects that Kavanaugh arrived back at the Beto Unit on December 7, 2018. *Id*. at pg. id. #579. Kavanaugh presented to the Medical Department on December 7, December 11, December 12, December 13, December 14, December 15, and December 18. *Id*. at pg. id. #580; 602; 605; 609; 613; 61; 62. During these visits, nursing staff conducted physical exams, performed an evaluation, took his vitals, ordered medications, issued referrals, and renewed/refilled his prescriptions. Each time Kavanaugh sought medical attention, he complained about pain but showed no signs of distress—further seeking an increase in his Tylenol #3, an early refill of his pain medication, and was often seen laughing, joking, and singing around staff and other patients.

### g. January 2019 Medical Care and Treatment

On January 4, 2019, the medical records show that Kavanaugh refused his rescheduled appointment with Hospital Galveston Pulmonary Medical Clinic and signed a refusal form, (Dkt. #46, pg. id. #642). The Medical Department received a sick call request from Kavanaugh wherein he sought another refill of his pain medication. *Id*. at pg. id. #641. On January 7, 2019, Kavanaugh was seen by the Medical Department by video for a telehealth visit; the nursing notes that Kavanaugh "wants TC #3," at which point medical staff scheduled him to see a provider for Tylenol #3 renewal. *Id*. at pg. id. #645. On January 8, 2019, Defendant Dr. Clayton ordered Kavanaugh Tylenol #3—two tablets twice daily. *Id*. at pg. id. #647. Dr. Clayton informed Kavanaugh on January 9, 2019, that his Tylenol #3 was renewed. *Id*. at pg. id. #649.

Dr. Adams's describes Kavanaugh's next trip to the hospital from the Beto Unit as follows, with footnote citations to the medical record omitted:

At 22:27 (10:27 PM) [on January 22, 2019], Mr. Kavanaugh presents to the medical department complaining of a sickle cell crisis with a pain at a level 2 on a scale of 1 to 10. He is alert and oriented x4 (i.e. oriented to person, place, time, and situation) with a steady gait. He exhibits facial grimacing but when instructed to go to the front room to have his vital signs taken, he is observed laughing and playing with offenders lined up in the hallway for laboratory testing. Mr. Kavanaugh's vital signs and exam are stable without significant findings. Nursing staff advise Mr. Kavanaugh about his schedule for receiving Tylenol #3. He is discharged from the clinic with instructions to drink plenty of fluids and to return if his condition worsens. Registered Nurse (RN) Amanda Stampley is the Charge Nurse on duty.

Shortly after midnight in the early morning of January 29, Mr. Kavanaugh presents to the Beto Unit medical department with "body aches all over" but mainly around his chest area. He is afebrile with an unremarkable blood pressure (148/76) but has tachycardia (heart rate of 125) and an abnormal EKG (electrocardiogram). He is placed on oxygen and intravenous (IV) fluids. 911 is called and Mr. Kavanaugh is transported via ambulance to the Palestine Regional Medical Center (PRMC).

Mr. Kavanaugh arrives to the PRMC emergency room at 1:05 AM. His cardiac status is evaluated and monitored. He is treated with additional IV fluids and medications (Morphine, Benadryl, and Dilaudid). He is diagnosed with sickle cell crisis and hypokalemia (low potassium). After about three hours. Mr. Kavanaugh is discharged at 4:18 AM. Upon arrival back to the Beto Unit, Mr. Kavanaugh is ordered 10 days of potassium supplements.

Mr. Kavanaugh's Tylenol #3 order is set to expire on January 29th at 10:32 AM. Dr. Clayton re-orders Mr. Kavanaugh's Tylenol #3, two tablets twice daily for 10 days. Mr. Kavanaugh's compliance with Tylenol #3 is documented as 95.24%. His compliance with his hydroxyurea is 55.81%.

(Dkt. #46, pg. id. #279-80; 653-70).

### h. February 2019 Medical Care and Treatment

Kavanaugh was seen, evaluated, and treated by medical staff at least seven times throughout the month of February 2019—including a brief stint at the hospital. He presented at the Medical Department at the Beto Unit on February 6, 2019 complaining about pain in his legs and to renew his pain medications. *Id*. at pg. id. #675. He stated that his pain level was a 0 on the scale of 1 to 10; an exam completed by Defendant Nurse Stampley showed unremarkable, and Kavanaugh was referred to a provider. *Id*. at pg. id. #677-78.

The next day, February 7, 2019, Kavanaugh ambulated to the Medical Department at the Beto Unit stating that he has "pain all over." He identified his pain level as an 8 out of 10. *Id*. at pg. id. #681. Nursing staff contacted a provider, who ordered that Kavanaugh be transported to the Palestine Regional Medical Center. *Id*. at pg. id. #682. In her affidavit, Dr. Adams describes Kavanaugh's treatment at the hospital:

> Mr. Kavanaugh is admitted to the PRMC emergency room at 10:33 PM on February 7th. Shortly after midnight (00:42) on February 8th, the PRMC treating provider (Nurse Practitioner Michael Grissett) documents—"The patient certainly has seeking type behavior. Patient is adamant that I give him another mg of Dilaudid along with another 25 mg of Benadryl. Patient states this is all that works for him. The patient also tells me that I must write for pain medication for him to take at the unit. He has providers there. He also has a standing order for Tylenol #3's but the patient is requesting that I write an order to increase the dose at the unit. I have told him that I will not write orders to increase his meds here . . . I have discussed this plan of care with the ER attending Dr. Jenkins. He states that the patient will not receive any further controlled medicines here. Patient is to be discharged back to his unit." Despite Mr. Kavanaugh's continued requests for additional pain medication and orders for increased pain medication at the unit, Nurse Practitioner (NP) Grissett and the attending physician, Dr. Jenkins, refuse. Mr. Kavanaugh is discharged from the PRMC emergency room back to the Beto Unit with a diagnosis of sickle cell disease without crisis.

(Dkt. #46, pg. id. #281). Once Kavanaugh returned to the Beto Unit, he was evaluated again by nursing staff. *Id*. at pg. id. #687. He was again referred to a provider for a medication renewal, and Defendant Dr. Clayton ordered Kavanaugh Tylenol #3, two tablets twice daily for thirty days. *Id*. at pg. id. #689. The medical records denote that Kavanaugh's compliance with taking his Tylenol #3 was 90.00%, and his compliance with hydroxyurea—for his sickle-cell disease—was 54.72%. *Id*. at pg. id. 686.

Moreover, Kavanaugh's medical records illustrate that he arrived at the Beto Unit Medical Department on February 16, 2019, with complaints of pain his joints. Nursing staff contacted Defendant Dr. Clayton, who then ordered Kavanaugh to receive IV fluids and to be monitored. Id.

at pg. id. #693. He eventually received his Tylenol #3, and minutes later asked to be returned to his cell.

Kavanaugh presented at the Medical Department three additional times in the remaining weeks of February 2019. Each time, he complained of pain and nursing staff evaluated him. He was provided fluids, hydration, oxygen, and his scheduled pain medication. He sought to increase his pain medication during his visit to medical on February 23, 2019 and sought an early-morning dose of his Tylenol #3 on February 27, but was told no—and was informed that he may return to the clinic for his next scheduled dose, (Dkt. #46, pg. id. #696; 713).

### i. March 2019 Medical Care and Treatment

During the month of March 2019, Kavanaugh was treated at least ten times. Specifically, he was seen and evaluated by medical—who ordered fluids, hydration, supplemental oxygen, pain medication, and referred him to providers. In one instance when Kavanaugh was ultimately transported to the hospital, Dr. Adams describes his treatment as follows, with citations to the record omitted:

> On March 1, Mr. Kavanaugh submits a Sick Call Request (SCR) to see the doctor for sickle cell pain but before a Sick Call appointment can be made, Mr. Kavanaugh ambulates to the medical department at 3:15 AM complaining that he is having a sickle cell crisis with upper and lower extremity pain at a level of 8 on a scale of 1 to 10. He states that he believes the pain is due to the stress of being placed in restrictive housing after being accused of an attempted escape. His blood pressure is 138/61 and his pulse is 99. His exam is normal without signs of distress. The on-call provider (Dr. Haque) is contacted by RN Amanda Stampley. Dr. Haque orders bolus (rapid rate) intravenous (IV) fluids with repeat vital signs every 15 minutes. At 5:35 AM, Mr. Kavanaugh is administered one dose of Tylenol #3 with no obvious distress noted. At 6:50 AM, Mr. Kavanaugh's care is passed to the next nursing shift. It is noted by the nurses assuming Mr. Kavanaugh's care that he is talking, laughing, and joking with the security officer.
>
> At 7:40 AM, Mr. Kavanaugh informs nursing staff that his pain level is still at an 8 and he wants to go to the emergency room (ER) "to get real medications." However, he shows no observable signs of distress and his blood pressure is 141/73 with a pulse of 67. At 8:00 AM, Dr. Haque orders that Mr. Kavanaugh return to his cell and orders him two Tylenol #3's even though Mr. Kavanaugh had his scheduled two Tylenol #3's at about 5:00 AM.

Eleven hours later, at 19:10 (7:10 PM), Mr. Kavanaugh ambulates back to the medical department and complains of "all over pain" at a level of 8 on a scale of 1 to 10. He does not appear to be in distress, but his pulse is elevated at 127. Dr. Haque orders that Mr. Kavanaugh be transferred to the local community emergency room.

Mr. Kavanaugh is admitted to the Palestine Regional Medical Center (PMRC) emergency room at 21:55 (9:55 PM). At PMRC Mr. Kavanaugh is noted to be "awake, comfortable, non-diaphoretic, and non-toxic . . . and well-hydrated' with a blood pressure of 131/78 and a pulse of 83. At 22:36 (10:36 PM), the treating physician (Dr. George Schroeder) documents "Based on the patient's history, exam, and evaluation there is no indication for emergency intervention or admission . . . I discussed with the patient [his] frequent requests for pain medications. Instructions have been given that, in the best interest of the patient, further pain RX's (prescriptions) must come from the patient's PCP (primary care provider) or a pain management specialist." The PRMC provider determines that Mr. Kavanaugh has "no emergent medical condition at this time." He is discharged from the PRMC emergency room to return at the Beto Unit.

(Dkt. #46, pg. id. 282-83; 730-31; 737-38).

### j. April 2019 Medical Care and Treatment

Kavanaugh identifies two specific dates in April 2019—April 10 and April 14—wherein he claims, on April 10, 2019, that he "would go to the medical department complaining of sickle cell crisis I was once again turned down by Nurse Stampley and told to go back to my cell," (Dkt. #10, pg. 5) (amended complaint). He also asserts that "he went to the Medical Department on April 14, 2019 and would see Nurse Goldman who would send me to the hospital" where he almost died. *Id*. He states that, rather than the named Defendants, only Nurse Goldman would send him to the hospital. *Id*. Dr Adams's and Kavanaugh's medical records address these claims:

On April 10th, the medical department receives a sick call request (SCR) dated April 8th in which Mr. Kavanaugh requests renewal of his pain medication prescriptions. (Mr. Kavanaugh also writes a SCR dated April 10th stating he needs to be seen for sickle cell crisis, but the SCR is not received until April 12, after Mr. Kavanaugh has already been seen on April 10th).

At 21:45 (9:45 PM) on April 10th, Mr. Kavanaugh presents to the medical department complaining that his "sickle cell is acting up." He is seen via the Nursing Protocol for Musculoskeletal Symptoms. Mr. Kavanaugh complains of "all over generalized pain" at a level of a 9 on a scale of 1 to 10. Nursing staff document that Mr. Kavanaugh's subjective

complaints do not match the objective findings. However, his blood pressure and pulse are slightly elevated. The on-call provider (Nurse Practitioner Oyolu) is contacted and orders that Mr. Kavanaugh be given Clonidine 0.1 mg. (Clonidine is a drug used to treat high blood pressure and opiate withdrawal symptoms). At 1:30 AM on April 11th, Mr. Kavanaugh's blood pressure is 119/68 and his pulse is 90. At 1:50 AM, Mr. Kavanaugh states that he feels much better and would like to return to his cell. At 2:05 AM, Mr. Kavanaugh is given his scheduled dose of Tylenol #3 and released to return to his cell. The Charge Nurse caring for Mr. Kavanaugh is RN Amanda Stampley.

(Dkt. #46, pg. id. #288; 982; 990; 993). With respect to the next date, Dr. Adams denotes the following:

At 23:10 (11:10 PM) on April 14th, Mr. Kavanaugh ambulates into the medical department complaining of generalized pain, worse in his joints. He states he has had the pain since about 6:00 PM and had already been drinking plenty of fluids. Mr. Kavanaugh's blood pressure is 152/101, his pulse is 93, and his temperature is 99.9. Dr. Harold Clayton is contacted and orders that Mr. Kavanaugh be transported to a community emergency room for evaluation.

On April 15th, Mr. Kavanaugh is admitted to the Palestine Regional Medical Center (PRMC) hospital for suspected sickle cell crisis. During this admission, he develops pulmonary edema and sputum cultures grow MRSA (methicillin-resistant staphylococcus aureus). Mr. Kavanaugh is treated with IV antibiotics and transferred to the UTMB/TDCJ Hospital in Galveston, Texas. (UTMB/TDCJ HG).

Mr. Kavanaugh is hospitalized at UTMB/TDCJ HG eight days from April 21 through April 29, 2019. During this hospitalization, he is treated with intravenous IV fluids, hydroxyurea, and narcotic pain medications. Pain Management Specialists are consulted and they recommend two days of Dilaudid followed by weaning from narcotic pain medications. However, the treating UTMB/TDCJ HG physicians (Dr. Velvin and Dr. Camarena) document in their Discharge Summary—"Hospital course was notable for patient being oppositional, defiant, and manipulative. Patient was not observed to be in distress, yet he frequently complained of uncontrolled pain and desired increase in narcotic dosages and/or frequency. However, patient was on an appropriate pain medication regimen. Patient was especially manipulative in efforts to obtain IV Benadryl. Patient claimed pruritus (itching) after receiving pain med and said he could not tolerate po (oral) Benadryl due to nausea. After receiving IV Benadryl, patient was observed by nursing to be pushing the buttons on the IV pump to increase the infusion rate. Patient was malcontent with prescribed tapering of[f] narcotics by pain consul, refusing Narco 5/325 upon discharge since he felt it was ineffective and instead opted for Tylenol #3.

(Dkt. #46, pg. id. #289; 996-1006).

Given Kavanaugh's extensive medical care at both the Beto Unit and various hospitals, Dr. Adams's provided a detailed summary and conclusion regarding his medical conditions and treatment as follows:

### Summary and Conclusion

Mr. Kavanaugh's sickle cell disease (SCD), morbid obesity, and obstructive sleep apnea (OSA) are serious medical conditions and Mr. Kavanaugh's certainly has "serious medical needs." However, many medical providers have found Mr. Kavanaugh very difficult to treat due to his manipulative and potentially self-destructive behaviors. Mr. Kavanaugh definitely needs pain medications, but he appears to misuse/abuse narcotics. He does not take his hydroxyurea as prescribed to reduce the incidence of his sickling of his red blood cells and painful vaso-occlusive events, but consistently demands frequent doses of very potent narcotics (e.g., Tylenol #3, Morphine, Dilaudid). Of note is that Mr. Kavanaugh has refused methadone to treat his pain. When a medical provider attempts to modify or reduce his narcotics usage, Mr. Kavanaugh engages in aggressive behavior (e.g. yelling, cursing, threats of litigation, etc.), falsehoods (e.g. "faked" attacks of priapism, overdoses, etc.) and acts of potential self-harm (e.g. hanging, insertion of objects into his rectum). Multiple medical institutions have documented Mr. Kavanaugh's drug seeking behavior and machinations to acquire strong narcotics. Some organizations have even banned Mr. Kavanaugh from non-emergent access to their facilities (e.g. Seton Hospital System in Austin, Texas).

The medical records reveal that UTMB/CMC medical staff at the George Beto Unit always examined Mr. Kavanaugh and assessed his condition whenever he presented to the medical department—which was quite frequently. Further, the medical records indicate that he was provided conscientious, competent, and professional care—even if he did not always receive the care he desired. Mr. Kavanaugh has chronic pain and episodes where the pain is acutely worse. However, his frequent claims of "crisis" are not always factual. Sickle cell pain is not always a "crisis" and does not always require laboratory studies, emergency room evaluation, or hospitalization. In fact, in the community, most sickle cell pain (both chronic and acute) is treated at home with hydration and medications (e.g. regular use of hydroxyurea and pain medication when needed). Beto Unit medical personnel appropriately treated Mr. Kavanaugh in the unit medical department when possible and transferred him to a community hospital emergency room when clinically indicated. The community emergency room physician then determined if return to the Beto Unit, local hospitalization, or transfer to the UTMB/TDCJ Hospital in Galveston was medically appropriate.

(Dkt. #46, pg. id. #290-91).

## IV. Legal Standards

Under 28 U.S.C. § 1915A, a court shall review any complaint in a civil action wherein a prisoner seeks redress from a governmental entity or officer, or employee of a governmental entity. During its review, the court must identify cognizable claims or dismiss the complaint or any portion thereof if the complaint is frivolous, malicious, or fails to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915A(b)(1).

A complaint is frivolous if it lacks an arguable basis in law or fact. *Samford v. Dretke*, 562 F.3d 674, 678 (5th Cir. 2009). The Fifth Circuit has held that a complaint lacks an arguable basis in fact when "the facts alleged are fantastic or delusional scenarios or the legal theory upon which a complaint relies is indisputably meritless." *Id.* (quoting *Harris v. Hegmann*, 198 F.3d 153, 156 (5th Cir. 1999) (internal quotation marks omitted)). In other words, during the initial screening under section 1915A, a court may determine that a prisoner's complaint is frivolous if it rests upon delusional scenarios or baseless facts—and dismiss the complaint. *See Henry v. Kerr Cnty., Tex.*, 2016 WL 2344231 *3 (W.D. Tex. May 2, 2016) ("A court may dismiss a claim as factually frivolous only if the facts alleged are clearly baseless, fanciful, fantastic, delusional, or otherwise rise to the level of the irrational or the wholly incredible, regardless of whether there are judicially noticeable facts available to contradict them.") (citing *Denton v. Hernandez*, 504 U.S. 25, 32-33 (1992)).

Moreover, a complaint fails to state a claim upon which relief may be granted where it does not allege sufficient facts which, taken as true, state a claim which is plausible on its face and thus does not raise a right to relief above the speculative level. *See Montoya v, FedEx Ground Packaging Sys. Inc.*, 614 F.3d 145, 149 (5th Cir. 2010) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A claim has factual plausibility when the pleaded factual content allows

the court to draw reasonable inferences that the defendant is liable for the misconduct alleged. *See Hershey v. Energy Transfer Partners, L.P.*, 610 F.3d 239, 245 (5th Cir. 2010); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This plausibility standard is **not** akin to a probability standard; rather, the plausibility standard requires *more than the mere possibility* that the defendant has acted unlawfully. *Twombly*, 550 U.S. at 556 (emphasis supplied).

Although all well-pleaded facts are taken as true, the district court need not accept true conclusory allegations, unwarranted factual inferences, or legal conclusions. *See Whatley v. Coffin*, 496 F. App'x 414, (5th Cir. 2012) (unpublished) (citing *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005)). Crucially, while the federal pleading rules do not require "detailed factual allegations," the rule does "demand more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. A pleading offering "labels and conclusions" or a "formulaic recitation of the elements of a cause of action" will not suffice, nor does a complaint which provides only naked assertions that are devoid of further factual enhancement. *Id*.

Furthermore, the Fifth Circuit has repeatedly upheld the District Court's use of a *Martinez* Report in which to develop the known facts of a case until it is satisfied that either the claims have merit or they do not:

> Due to the potential abuses by prisoners proceeding *in forma pauperis*, this circuit has given district courts broad discretion in making the determination of whether an *in forma pauperis* complaint is frivolous. As we have noted before, it is not always easy to determine whether a claim is frivolous simply by examining a complaint written by a prisoner unfamiliar with the rules of our courts. Prisoner complaints, more often than not, are difficult to decipher. However, this court has insisted that when it is not apparent from the fact of the complaint whether the prisoner's contentions are frivolous or not, the district court should make an effort to develop the known facts until satisfied that either the claims have merit or they do not. We have suggested that this may be done in a number of ways.

*Parker v. Carpenter*, 978 F.2d 190, 191 (5th Cir. 1992) (citing *Cay v. Estelle*, 789 F.2d 318, 325 (5th Cir. 1986) (internal citations omitted)). The Fifth Circuit has explained that ordering prison

officials to investigate the facts surrounding a prisoner's complaint enables the district court to determine frivolity. *See Cay*, 789 F.3d at 193, n.2 ("In addition, this circuit cited with approval the procedure developed by the Tenth Circuit: ordering the prison officials to investigate the facts surrounding a civil rights suit by inmates to construct 'an administrative record … to enable the trial court to … make a determination [of frivolity]….'") (citing *Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978)).  The Fifth Circuit, in *Cay*, explained that "[e]xpansion of the record protects the unskilled litigant and enables the court to make an informed decision regarding the merits of an action by reference to the reality of the situation rather than by speculating as to the nature of the claim." *Id*. at 324 (citing *Anderson v. Coughlin*, 700 F.2d 37, 41 (2nd Cir. 1983)).

The Fifth Circuit has continually upheld a district court's reliance on a *Martinez* Report in a prisoner civil rights lawsuit alleging deliberate indifference to serious medical needs. *See Bailey v. Vincent*, 694 F. App'x 283, 284 (5th Cir. 2017) (Mem.) (unpublished) ("Second, although the State raised affirmative defenses in its *Martinez* report, Bailey has shown no error in the district court's reliance on the report, which was otherwise proper under the circumstances.") (citing *Parker*, 978 F.2d at 191 n.2).

This is especially true when there is extensive medical records and the Plaintiff's pleadings show his disagreement with treatment provided. *See, e.g.*, *Tijerina v. Stanley*, 804 F. App'x 277, 278 (5th Cir. 2020) (Mem) (unpublished) (affirming finding of frivolity based on *Martinez* Report, finding that "Tijerina's argument that he provided evidence to support his claims, without more, fails to show a nonfrivolous issue challenging the district court's decision that his voluminous medical records established that he received treatment and that he simply disagreed with that treatment."); *Bakre v. Kendall*, 20-40660, 2022 WL 1165649, at *1 (5th Cir. Apr. 20, 2022) (affirming finding of frivolity based on *Martinez* Report, finding that "Bakre received extensive

19

treatment but disagreed with particular aspects of that treatment. Thus, the district court correctly concluded that Bakre failed to meet the extremely difficult standard for showing deliberate indifference to serious medical needs.").

## IV. Discussion and Analysis

A liberal review of Kavanaugh's amended complaint shows that he is raising claims concerning medical deliberate indifference to his serious medical needs and the failure to protect him from a "safe environment" concerning his lack of medical care. Specifically, he contends that Defendants acted with deliberate indifference by (1) failing and refusing to treat his sickle cell anemia, (2) refusing to take him to a local hospital to receive medical care, and (3) denying him a transfer to a different medical unit. He also states that Defendant Jackson, as Warden, kept him in "an environment that was bad for [his] health" and posed a life-threatening situation.

However, even accepting Kavanaugh's claims as true, all of his claims are frivolous. Kavanaugh's claims—and his voluminous medical records—show nothing more than his disagreement with the extensive and continuous treatment provided to him by the Defendants. Simply stated, while Kavanaugh states that Defendants refused to transport him to the hospital, the undisputed medical records show that Kavanaugh was ordered to be transported to the hospital countless times. Likewise, while Kavanaugh claims that Defendant Stampley refused to treat him, the undisputed evidence shows otherwise.

With respect to his medical claims, all of them are refuted by the undisputed medical records and Dr. Adams's affidavit. Kavanaugh's failure-to-protect claim against Defendant Jackson fails to state a claim upon which relief may be granted.

1. Deliberate Indifference to Serious Medical Needs

Deliberate indifference to a prisoner's serious medical needs constitutes an Eighth Amendment violation and states a cause of action under section 1983. *See Jackson v. Cain*, 864 F.2d 1235, 1244 (5th Cir. 1989). In *Farmer*, 511 U.S. 835 (1994), the Supreme Court noted that deliberate indifference involves more than mere negligence. The Court concluded that "a prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to inmate health or safety; . . . the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Id*. at 837.

The Fifth Circuit has discussed the high standard involved in demonstrating deliberate indifference as follows:

> Deliberate indifference is an extremely high standard to meet. It is indisputable that an incorrect diagnosis by medical personnel does not suffice to state a claim for deliberate indifference. *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985). Rather, the plaintiff must show that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id*. Furthermore, the decision whether to provide additional treatment "is a classic example of a matter for medical judgment." *Estelle*, 429 U.S. at 107. And, the "failure to alleviate a significant risk that [the official] should have perceived, but did not" is insufficient to show deliberate indifference. *Farmer*, 511 U.S. at 838.

*Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). In the medical care context, "[u]nsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does an inmate's disagreement with his medical treatment, absent exceptional circumstances." *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006). Moreover, "medical records of sick calls, examinations, diagnosis, and medications may rebut an inmate's allegations of deliberate indifference." *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th

Cir. 1995) (affirming the district court's summary dismissal of Banuelos's lawsuit based on his medical records rebutting his claim of medical deliberate indifference).

Additionally, the Fifth Circuit issued a published opinion, affirming this Court's granting of summary judgment in a separate case in favor of defendants within regard to a plaintiff's claim of medical deliberate indifference. *See Petzold v. Rostollan*, 946 F.3d 242 (5th Cir. 2019). Petzold, a diabetic federal prisoner, injured his ankle while exercising. *Id*. at 245. The Fifth Circuit outlined the pertinent facts as follows, with footnotes to citations omitted:

> One Friday in October 2013, Petzold injured his ankle. He quickly iced it, but it swelled, and the pain became "excruciating." On his walk to the daily insulin-dispensing line, Petzold told a correctional officer about his injury. Petzold also claims that Mike Rostollan, a prison nurse, passed Petzold in the hallway and commented on his limp.

> Petzold waited in line for insulin. When it was his turn, he asked Rostollan, the dispensing nurse, to evaluate his ankle and render aid after the insulin line concluded. Rostollan, without looking at Petzold's ankle, told Petzold to "purchase some" pain medication—though the commissary was closed for the weekend—or "find some [pain medicine] on the unit," and "put some ice on it."

*Id*. at 246. A few days later, Petzold was treated by another nurse, with X-rays showing that his ankle was slightly fractured. *Id*. at 247. Petzold then filed his section 1983 complaint alleging that Defendant Rostollan acted with deliberate indifference to his serious medical needs in violation of the Eighth Amendment.

After explaining that the deliberate indifference standard is extremely high, the Fifth Circuit found that Defendant Rostollan's actions and statements did not constitute deliberate indifference. Specifically, the Court stated reasoned:

> As a matter of law, Rostollan's instruction for Petzold to ice his ankle was medical treatment. It was medical treatment because it was medical advice that Petzold could, and did, effectuate. Petzold argues that the prescribed "treatment" was not based on an evaluation, lacked specific instructions, and was ineffective. But, because medical treatment was provided, even if it was negligent, disagreed-with, and based on a perfunctory and inadequate evaluation, it was not denied. Under governing precedent,

imperfect treatment does not equal denied treatment. And a disagreement with recommended treatment is generally insufficient to show deliberate indifference.

*Petzold*, 946 F.3d at 250-51.

Here, Kavanaugh's voluminous and detailed medical records during the time period about which he complains confirm Dr. Adams's summary: He received extensive medical treatment from medical personnel at the Beto Unit—including the named Defendants—and simply disagrees or is unhappy with how he was treated. The record, however, does not indicate or show that Defendants refused to treat him, ignored his complaints, intentionally mistreated him, or evinced a wanton disregard for his medical needs. *See McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir. 1997) ("Deliberate indifference encompasses only the unnecessary and wanton infliction of pain repugnant to the conscience of mankind.").

It is well-settled that mere disagreement with a course of treatment or dissatisfaction with medical treatment does not constitute deliberate indifference under the Eighth Amendment. *See Gobert*, 463 F.3d at 346; *see also Blank v. Bell*, 634 F. App'x 445, 448 (5th Cir. 2016) ("Blank's desire to see Dr. Sandknop more often amounts to a disagreement over his treatment, which, as discussed *supra*, does not rise to the level of deliberate indifference.").

As mentioned, Kavanaugh maintains that Defendants refused to treat him, refused to transport him to a local hospital, refused to transfer him to a prison unit closer to Hospital Galveston, neglected his medical needs, and placed him in a "life-threatening" situations due to his lack of medical care. Kavanaugh identifies January 27, 2019, February 2019, March 2019, and April 10 and April 14, 2019.

The undisputed medical records, however, show otherwise. The *Martinez* Report contains hundreds of pages of Kavanaugh's medical records from the Beto Unit—dating back from September 2018—detailing extensive medical treatment, diagnoses, performing diagnostic tests,

placing him on oxygen and monitoring, ordering pain medications, supplementing pain medication, and multiple transports to local hospitals. Kavanaugh's claims against the named Defendants are refuted by the record. In January 2019, as one example, Kavanaugh presented to the Beto Unit Medical Department via a telehealth visit and the following date Defendant Dr. Clayton refilled his Tylenol #3 pain medication. Therefore, Kavanaugh's claim that Defendant Dr. Clayton "refused to treat him" or allowed him to go through pain and suffering is refuted by the undisputed medical records.

Kavanaugh presented to the Beto Unit Medical Department again on January 22, 2019; Defendant Stampley examines him—she took his vitals and advised him about his schedule for receiving his pain medication. Accordingly, contrary to Kavanaugh's claims, Defendant Stampley did not refuse to treat him. Moreover, on January 29, 2019, Kavanaugh arrived back at medical and was placed on oxygen after receiving an EKG; 911 was called and he was transported to the hospital. Once he returned from the hospital to the Beto Unit, Defendant Dr. Clayton re-ordered his Tylenol #3 pain medication—thereby rebutting Kavanaugh's claims that Dr. Clayton—or any named Defendant—refused to transport him to the hospital when needed.

Similarly, in both February and March 2019, Kavanaugh was evaluated by medical at least nine different times and was transported to the hospital during both months. During his visits both months, Defendant Stampley treated and evaluated him, and Defendant Clayton continued to order him pain medication. Kavanaugh was treated and evaluated again in April 2019—by Defendant Stampley on April 10-11, 2019. On April 14, 2019, Defendant Clayton evaluated him and again ordered him to be transported to the hospital for evaluation. Kavanaugh's claim that only Nurse Goldman would send him to the hospital is patently refuted by the medical records.

To the extent Kavanaugh argues that he should have been transported to the hospital sooner, that the Beto Unit does not have the correct blood testing abilities, or that medical staff should have provided additional or better treatment, such claims also do not constitute deliberate indifference. *See, e.g.*, *Estelle*, 429 U.S. at 107 ("But the question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a class example of a matter for medical judgment.  A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment."); *Trujillo v. Arce*, 109 F. App'x 668, 670 (5th Cir. 2004) (unpublished) ("Arce's decision to continue treating the pain with medication and monitoring Trujillo's progress rather than to refer him to a specialist shows only a difference of opinion as to the proper course of treatment," which does not demonstrate a constitutional violation); *Russell v. Ivans*, 2008 WL 4584776 *1 (5th Cir. 2008) (unpublished) ("Therefore, Russell's allegations are merely disagreements with the type of care that he was provided; Russell cannot state a § 1983 cause of action on this basis.").

The Court would be remiss if it failed to address the recent Fifth Circuit opinion in *Davis v. Lumpkin*, case number 19-20873. In *Davis*, the Fifth Circuit reversed and vacated, in part, the district court's use of a *Martinez* Report in finding that a *pro se* plaintiff's claims of medical deliberate indifference were frivolous. Davis alleged an officer at the Polunsky Unit applied "an unwarranted use of force" against him and intentionally fractured his foot and ankle. He also alleged that the subsequent failure to treat him and the delay in treatment occurred because prison staff intentionally misdiagnosed him as a cover-up scheme to protect the officers who caused the injury. The Fifth Circuit ultimately found that the medical records could not resolve Davis's contentions that he was treated incorrectly or that his injury was ignored because prison officials intentionally pursed a cover-up scheme. In other words, the Fifth Circuit determined that medical

records could not resolve Davis's claims of an intentional delay and/or purposeful incorrect mistreatment because of a cover-up scheme. *See Davis v. Lumpkin*, 2022 WL 1791945, at *1-4 (5th Cir. June 2, 2022) (holding that "[w]e conclude that if the *Martinez* report conflicts with the pro se plaintiff's allegations, the district court must accept the plaintiff's allegations as true, not the records in the report.").

Here, Kavanaugh's allegations are factually distinct and distinguishable from the allegations raised in *Davis*. While Davis alleged that treatment to his injury—an injury stemming from a use-of-force—was intentionally delayed and inadequate because it was part of a cover-up scheme, Kavanaugh maintains that Defendants outright refused to treat him and refused to send him to a hospital—which is patently refuted by the records. The Fifth Circuit has squarely held that medical records can refute allegations of deliberate indifference. *See Banuelos*, 41 F.3d at 235 (affirming the district court's summary dismissal of Banuelos's lawsuit based on his medical records rebutting his claim of medical deliberate indifference). This holding has been reaffirmed in other cases involving *Martinez* Reports. *See, e.g.*, *Tijerina*, 804 F. App'x 277, 278 (5th Cir. 2020) (Mem) (unpublished); *Bakre*, 20-40660, 2022 WL 1165649, at *1 (5th Cir. Apr. 20, 2022).

The record in the present case plainly demonstrates that Kavanaugh received a significant quantum of medical care and refutes any claim of deliberate indifference to his serious medical needs. *See Stewart v. Murphy*, 174 F.3d 530, 537 (5th Cir. 1999). Unlike the allegations raised in *Davis*, here, Kavanaugh's claims—the failure to treat, failure to transport him to a hospital, and medical neglect—can be resolved through the medical records denoting extensive treatment. Additionally, unlike Davis, Kavanaugh does not challenge the accuracy of the medical records.

In a similar case wherein the record included ample medical records refuting a plaintiff's claims, the Fifth Circuit observed the following—with footnotes omitted:

It is amply clear that prison officials were neither reckless nor deliberately indifferent to Norton's admittedly serious medical needs. In fact, the record demonstrates that quite the opposite was true. There is extensive evidence in the record that prison officials afforded Norton a great deal of medical care and attention.

The medical records indicate that Norton was afforded extensive medical care by prison officials, who treated him at least once a month for several years, prescribed medicine, gave him medical supplies, and changed his work status to reflect the seriousness of his problem. Norton's complaints about the treatment he has received, and the facts he alleges, simply do not state a claim for deliberate indifference.

*Norton v. Dimazana*, 122 F.3d 286, 291-92 (5th Cir. 1997) (holding that "the district court correctly dismissed this action as frivolous").

Here, as in *Norton*, Kavanaugh's medical records show that his claims of deliberate indifference to his serious medical needs are frivolous. Kavanaugh's medical records denote that prison officials afforded him extensive medical care. His allegations that prison officials neglected his medical needs, refused treatment, and refused to take him to the hospital are patently refuted. While Kavanaugh repeatedly claims prison officials failed to treat him and failed to transport him to the hospital, the Court notes that Kavanaugh's amended complaint, (Dkt. #10), was written while he was admitted at Hospital Galveston in May 2019. Kavanaugh's allegations of deliberate indifference to his serious medical needs are frivolous and should be dismissed.

### 2. Failure to Protect

Kavanaugh maintains that Defendants failed to protect him from life-threatening situations because of alleged medical neglect at the Beto Unit. Specifically, he contends that Defendants refused to transfer him to a prison unit closer to Hospital Galveston and caused him pain and suffering because they neglected his medical needs.

The Court has addressed Kavanaugh's claims regarding his medical care. His extensive treatment and hospital visits do not indicate or show deliberate indifference. As the voluminous

medical records show, as the Fifth Circuit held in *Norton*, "the record demonstrates quite the opposite."

Turning to Kavanaugh's failure-to-protect claim, the Eighth Amendment's prohibition against the imposition of cruel and unusual punishment requires prison officials to protect prisoners from violent attacks by other prisoners; however, not every injury suffered by a prisoner rises to the level of a constitutional violation. *See Horton v. Cockrell*, 70 F.3d 397, 400 (5th Cir. 1995) (citing *Farmer v. Brennan*, 511 U.S. 825 (1994)). The deliberate indifference standard is very difficult to meet. *See Domino*, 239 at 756. The Supreme Court elaborated by holding that:

> [A] prison official cannot be held liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of an disregards an excessive risk to inmate health and safety; the official must be both aware of facts from which the inference could be drawn that as substantial risk of serious harm exists, and he must also draw the inference. …
>
> But an official's failure to alleviate a significant risk which he should have perceived, but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

*Farmer*, 511 U.S. at 837-38. The Court further explained that prison officials who have actual knowledge of a risk of harm may not be held liable if "they responded reasonably to the risk, even if the harm ultimately was not averted." *Id*. at 844-45 ("[P]rison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause."). Crucially, in order to show that prison officials were deliberately indifferent to a prisoner's need for protection, the prisoner must prove "that the official *actually knew* of a substantial risk of serious harm and *failed to act*." *Adeleke v. Heaton*, 352 F. App'x 904, 907 (5th Cir. 2009) (per curiam) (unpublished) (emphasis added).

Here, Kavanaugh fails to state a claim for deliberate indifference to his safety/failure to protect upon which relief may be granted. His claim that prison officials placed him in an unsafe

environment stems from his claims that prison officials acted with deliberate indifference to his medical needs. Because his voluminous medical records show otherwise, Kavanaugh's claims fail. With respect to his claim that prison officials refused to transfer him to a prison unit closer to Hospital Galveston, the Court notes that prisoners do not have a constitutional right to choose where they are housed. *See McKnight v. MTC*, 2015 WL 7730995, at *3 (N.D. Tex. Nov. 9, 2015) ("It is well-settled that prisoners do not have a constitutional right to choose their place of confinement, security classification, housing assignment, and cellmate.") (citing *Olim v. Wakinekona*, 461 U.S. 238, 245 (1983)). This claim should be dismissed.

<u>RECOMMENDATION</u>

For reasons explained, it is recommended that Plaintiff Kavanaugh's civil rights lawsuit be dismissed, with prejudice, as both frivolous and for the failure to state a claim upon which relief may be granted.

Within fourteen (14) days after receipt of the Magistrate Judge's Report, any party may serve and file written objections to the findings and recommendations contained in the Report.

A party's failure to file written objections to the findings, conclusions and recommendations contained in this Report within fourteen days after being served with a copy shall bar that party from *de novo* review by the district judge of those findings, conclusions and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court. *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

So ORDERED and SIGNED this 21st day of June, 2022.

_K. Nicole Mitchell_
K. NICOLE MITCHELL
UNITED STATES MAGISTRATE JUDGE